IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEVON BRYCE POLAND | Magistrate No. 20-59 |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorneys Justin E. Herdman, United States Attorney for the Northern District of Ohio and Duncan T. Brown, Assistant U.S. Attorney, respectfully moves this Court to detain the defendant, DEVON BRYCE POLAND ("Poland" or the "defendant"), as a danger to the community and a serious risk of flight pending trial in this case. As the complaint and evidence in this case demonstrate, Poland traveled in interstate commerce with the expressed intention of joining an ongoing riot in Cleveland, Ohio, and to further this goal offered to purchase supplies for Molotov cocktails before learning his codefendant, Brandon Athlof Long, already had them. Also found in possession of the defendant and Atholf Long were the following items to aid in the rioting: a firearm, two magazines of ammunition, two containers of Sterno Gel Fire Starter, a hammer, and spray paint. When they were arrested, they had a bottle of liquor they had looted from a Cleveland bar. Poland is facing a possible sentence of up to 20 years. He is a danger to the community and a serious flight risk and should be detained pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A) and (B).

**APPLICABLE LAW**

Under the Bail Reform Act, the defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the

appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). A finding of either risk of flight or danger is sufficient for detention. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).

The government must prove the defendant presents a danger to the community and a risk of flight only by a preponderance of the evidence, not by clear or convincing evidence or other, more demanding standards. *United States v. Namer*, 238 F.3d 425, 2000 WL 187012, at *1 (6th Cir. Dec. 12, 2000) (unpublished) ("However, the government need only demonstrate the risk of flight by a preponderance of evidence."); *see also United States v. Alexander*, 742 F. Supp. 421, 423 (N.D. Ohio 1990) (same).

At a detention hearing, the government may present evidence by way of a proffer. *United States v. Stone*, 608 F.3d 939, 948-49 (6th Cir. 2010) ("[C]onducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court."); *United States v. Webb*, 238 F.3d 426, 2000 WL 1721060, at *2 (6th Cir. Nov. 6, 2000) (unpublished) ("The government may proceed in a detention hearing by proffer or hearsay.").

In assessing the risk of flight or danger to the community presented by the defendant, the Court must assess factors including (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)-(4). As set forth below, each of these factors weighs in favor of detaining the defendant, Poland.

**Bail Reform Act's Procedure for Out-of-District Arrests**

The Bail Reform Act governs both the procedures for detention and the factors that courts should consider when evaluating a motion for pretrial detention. While a defendant may choose

2

to challenge a detention motion in his district of arrest, the Act makes clear that the prosecuting district—here, the U.S. District Court for the Northern District of Ohio—makes the final determination. 18 U.S.C. § 3145(a). *See, e.g.*, *United States v. Torres*, 86 F.3d 1029, 1031 (11th Cir. 1996) ("The plain language of section 3145 dictates that the district court with original jurisdiction over the offense, *i.e.*, the prosecuting district, here the Southern District of Texas, is the only proper one to review the order in question.").

Any order of release on bond in the arresting district is subject to an immediate stay pending an appeal in the prosecuting district, where the defendant would be transported in custody. *Torres*, 86 F.3d at 1031. Congress did not give authority to the courts in the arresting district to "dissolve the stay" of any bail order, as "a district judge in the district of arrest may not effectuate the defendant's release on bail and deprive the district of prosecution of the power to hear a revocation motion." *United States v. Velasco*, 879 F. Supp. 377, 378 (S.D.N.Y. 1995); *see also Torres*, 86 F.3d at 1031 (noting that under 18 U.S.C. § 3145 the arresting district lacks jurisdiction to challenge any stay order from the prosecuting district).

**FACTUAL BACKGROUND**

The facts of this case are more fully set forth in criminal complaint in this case and incorporated herein by reference.

On or about May 30, 2020, there was a peaceful protest march planned in Cleveland, Ohio, in the Northern District of Ohio, starting at Willard Park, on the northwest corner of Lakeside Avenue and East 9th Street, and ending at the Justice Center, located on Lakeside Avenue between Ontario Avenue and West 3rd Street. The march began at approximately 2:00 p.m. and was scheduled to end at approximately 5:00 p.m.

At approximately 3:30 p.m., certain individuals in front of the Justice Center began

3

throwing rocks, bottles, and other items at law enforcement officers. Some individuals used spray paint to vandalize buildings, streets, and other structures with anti-police and anti-government slogans.

At approximately 3:50 p.m., members of the Cuyahoga County Sherriff's Office began using non-lethal techniques to disperse the crowds in front of the Justice Center. Certain individuals continued to throw items at the police and vandalize structures. At least three Cleveland Police Department zone cars were set on fire by individuals in the crowd.

From approximately 4:00 p.m. until approximately 9:45 p.m., certain demonstrators continued to break windows of the Justice Center and surrounding buildings, knock over garbage cans and conduct other acts of vandalism. An additional four city-owned cars were set on fire during this time. The Cleveland Police Department and the City of Cleveland issued orders via megaphone, Twitter, social media, and contact with news outlets for all demonstrators to disperse.

At approximately 7:30 p.m., the Cleveland Police Department and the City of Cleveland issued a curfew to begin at 8:00 p.m. and remain in effect until 12:00 p.m. on May 31, 2020. At approximately 7:30 p.m., the Cleveland Police Department and the City of Cleveland issued an order establishing a civil order prohibiting any persons from being on the streets or in a vehicle in downtown Cleveland.

At approximately 8:00 pm Pollard and Long departed Erie, Pennsylvania for Cleveland, Ohio; departing *after* the curfew began. The two defendants had in their possession a firearm with ammunition, gel fire starter, spray paint, and a hammer. They arrived in downtown Cleveland approximately two hours after the curfew began and, based on their own texts, arrived with the intent to loot, riot and cause damage. Indeed, as they proclaimed to people on social

4

media, they traveled to Cleveland, Ohio, not to support or engage in peaceful protest and marches, but to mute those voices with fire, riot and mayhem.

At approximately 11:55 p.m., Detective Habeeb and Commander Connelly of the Cleveland Police Department were on patrol enforcing the curfew when they observed a dark SUV parked on East 8th Street midway up the alley facing south, which is opposite the posted direction of travel for the one-way road. Det. Habeeb and Cmdr. Connelly observed Long wearing a commercial style filter mask walking out of the alley from near the SUV and north bound towards Det. Habeeb and Cmdr. Connelly's position onto Huron Road west bound. Det. Habeeb and Cmdr. Connelly observed Long walk in a circular route on the sidewalk and then back towards the alley. Long walked around Det. Habeeb and Cmdr. Connelly's vehicle and appeared to be observing Det. Habeeb and Cmdr. Connelly.

As stated in the complaint, defendants Poland and Althof Long were placed under arrest for curfew violations. A federal magistrate judge in the Northern District of Ohio authorized a search warrant for Poland's cellular telephone, which contained text messages written by Poland on May 30, 2020, from both Facebook Messenger and Snapchat.

**Defendant poses a danger to the community**

The nature and circumstances of the defendant's offense, as demonstrated by the weight of evidence against him, demonstrate the need to protect society.

The defendant chose to travel to a city he did not live in to riot, loot, and engage in acts of civil unrest. Poland did not arrive in Cleveland accidentally, he did not go to Cleveland in the heat of the moment, he was not overcome with rage or indignation over recent events. Poland searched out locations outside of his hometown of Erie, Pennsylvania, where riots were escalating, Poland made sure he had supplies to use during the riots, and tried to bring people

5

with whom to riot. He had a car ride of over 100 miles from Erie, Pennsylvania, to Cleveland, Ohio, -- almost two hours -- to think about his potential actions. When he arrived in Cleveland, Poland put his plan to loot in action and stole a bottle of alcohol from a bar. As the timeline of his own texts show, he had one intent in travelling to Cleveland, Ohio, an intent to riot and do damage to the stores and community of Cleveland, Ohio. The following text messages were recovered from Poland's phone and provide a timeline of his intentions and actions on May 30, 2020.

- At approximately 5:17 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND asking, "Wanna go to Pittsburgh and watch the riots."

- At approximately 5:19 p.m., using Facebook Messenger, POLAND replied, "Is there actually riots? IK (I know) philly is wilding."

- At approximately 5:20 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND, "They lit it on fire lmao (laugh my a** off)."

- At approximately 5:24 p.m., using Facebook Messenger, POLAND responded, "I wanna s**t kinda but my future wife needs me."

- At approximately 5:25 p.m., using Facebook Messenger, ALTHOF LONG responded, "This is a once in a life time thing you can witness and maybe participate in."

- At approximately 5:25 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND, "Or tell her you gotta go overthrow the govt first."

- At approximately 5:42 p.m., using Snapchat, POLAND messaged INDIVIDUAL 1[1] about attending protests stating, "I'm gonna go set s**t on fire."

---

[1] Recipients of text messages who did not travel with Poland from Pennsylvania to Ohio to riot are identified as

6

- At approximately 6:10 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND, "Unless things change. Cleveland seems like a better spot to riot watch."

- At approximately 6:11 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND, "Police shooting teargas and flash bangs, Pittsburgh hasn't had much of that."

- At approximately 7:09 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND about buying supplies for their travel to Cleveland and asked if POLAND wanted goggles. POLAND replied, using Facebook Messenger, "Yes," and also asked for "a bandana" and a "backpack."

- At approximately 7:10 p.m., using Facebook Messenger, POLAND messaged ALTHOF LONG asking, "Should we bring Molotov supplies?"

- At approximately 7:11 p.m., using Facebook Messenger, POLAND messaged INDIVIDUAL 2, asking, "Bruh you tryna go to Cleveland and riot?"

- At approximately 7:17 p.m., using Facebook Messenger, ALTHOF LONG responded, "Sadly enough I think I have everything needed for a Molotov in my car. Like normally."

- At approximately 7:18 p.m., using Facebook Messenger, POLAND messaged INDIVIDUAL 2 stating, "I'm gonna try bro. ALTHOF is really tryna go do this s**t."

- At approximately 7:20 p.m., using Facebook Messenger, POLAND messaged INDIVIDUAL 2 stating, "He's got Molotov cocktails and everything."

---

"Individual #" to protect their identity.

7

- At approximately 7:48 p.m., using Facebook Messenger, POLAND messaged INDIVIDUAL 2 stating, "Yeah they are locking the city [Pittsburgh] down. I'm finna loot Cleveland. You want some designer s**t?"

- At approximately 7:48 p.m., using Facebook Messenger, POLAND messaged ALTHOF LONG, stating, "Pittsburgh is s**t down."

- At approximately 7:49 p.m., using Facebook Messenger, POLAND messaged ALTHOF LONG, stating, "[t]he city is blocked shut bro."

- At approximately 7:50 p.m. and 7:56 p.m., using Facebook Messenger, ALTHOF LONG responded, "Cleveland is more lit anyway," and "[a]nd if not Pittsburgh then we can hit Cleveland OH."

- At approximately 8:02 p.m., using Facebook Messenger, ALTHOF LONG messaged POLAND that he was leaving to pick him up and at approximately 8:04 p.m. POLAND responded, using Facebook Messenger, by providing ALTHOF LONG the address in Erie, Pennsylvania, where ALTHOF LONG should go.

- At approximately 8:30 p.m., using Snapchat, POLAND messaged INDIVIDUAL 3 stating, "I'm going to Cleveland to riot."

- At approximately 8:30 p.m., using Snapchat, POLAND again messaged INDIVIDUAL 3 stating, "I'm gonna see if I can't break into a designer store."

- At approximately 11:57 p.m., using Snapchat, POLAND messaged INDIVIDUAL 4 stating, "My phone died but me and mass n****s busted into some bars. I got a whole a*s bottle of liquor."

In addition to the texts Poland sent demonstrating his intent to riot and cause civil unrest, once subject to questioning by police, Poland and Althof Long were evasive and dishonest. Det.

8

Habeeb conducted a pat down of the Poland against the rear of the SUV and recovered a folding knife that had been clipped to the front pocket of Poland's hooded sweatshirt. Poland had no identification or wallet on his person. Det. Habeeb asked Poland where his identification was and Poland stated he didn't know. Det. Habeeb asked POLAND if there were any weapons in the vehicle to which POLAND stated there was a BB gun and a knife in the car. Inside the car, in addition to the BB gun, officers discovered a hammer, two containers of Sterno Fire Starter Gel, and a Glock firearm with two fully loaded magazines.

Simply, these charges stem from Poland traveling to a city and a community he was not part of - he went to Cleveland expressly to cause destruction and engage in rioting and looting. While the argument could be made that he no longer poses a threat because there are no more riots to join or curfews to violate, such an argument is short-sighted and, frankly, crass. Rather, the danger Poland poses is from his willingness to spread mayhem and fear in a city which he does not reside. Instead of using empathy and compassion to let communities outside of his to deal with complex issues together, let alone try to engage with his own community in a meaningful or positive way, he saw the civic turmoil as an opportunity to travel to a community to engage in rioting and looting for his own personal thrill. Plainly, the danger is not just in Poland's actions or potential actions, but in his dismissive and wanton mindset and attitude towards society at large.

**Defendant is a flight risk from the Northern District of Ohio**

The government avers that the analysis for risk of flight should be performed from the perspective of the locus of the crime and the prosecuting jurisdiction, the Northern District of Ohio. Poland does not reside in the Northern District of Ohio. Poland is not employed in the Northern District of Ohio. Poland has no family, social or community ties to the Northern

9

District of Ohio. The only ties Poland has to the Northern District of Ohio are those he created when he traveled to Cleveland, Ohio, two hours after the curfew started, to engage in acts in furtherance of riot, civil unrest, and the use of fire to commit felonies.

The defendant will be expected to appear in court in the Northern District of Ohio, but the Pre-Trial Report is silent to how that travel will be accomplished. While he has a mother who lives approximately 16 miles away from Erie, Pennsylvania, there is no indication she, acting as a third-party custodian, or his live-in girlfriend, is willing or able to ensure his presence in the Northern District of Ohio. Indeed, relying on his girlfriend to secure his presence does not augur well for compliance, on the day of his arrest, his live-in girlfriend attempted to shove officers with the Erie Police Department and prevent them from making a lawful arrest of Poland.

Even if a solution involving electronic monitoring was proposed, the government suggests that would create an unnecessary burden on two separate Pre-Trial Services offices. Finally, the government avers that the defendant was not honest with Pre-Trial Services. On Poland's phone are texts he wrote about his use of LSD, marijuana, and his ongoing sale of illegal drugs, yet the report indicates he told pretrial services he does not use illegal narcotics.

## CONCLUSION

For the foregoing reasons, there is no condition or combination of conditions that can reasonably assure the defendant's appearance for proceedings in this case. The government

10

respectfully requests that the Court grant the government's motion to detain the defendant without bail pending trial in this case.

                            Respectfully submitted,

                            JUSTIN E. HERDMAN
                            United States Attorney

BY:    /s/ Duncan T. Brown
        Duncan T. Brown (NY: 3982931)
        Assistant United States Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3933
        (216) 522-8355 (facsimile)
        Duncan.Brown@usdoj.gov